WARNER BROS. PICTURES, INC., Appellant, *v.* SOUTHERN TIER THEATRE CO., INC., Respondent.

Third Department, January 9, 1952.

*Clayton R. Lusk* for appellant.

*Wilfrid E. Rhodes* for respondent.

BERGAN, J. Defendant is the owner of a theatre building in Elmira. In 1925 it leased the real property together with certain personal property usable for theatre purposes. By assignment plaintiff became the tenant.

The lease contained this clause: " Landlord agrees with reasonable diligence to repair the damage where the premises are rendered untenantable by fire or the elements."

A new lease was entered into between plaintiff and defendant in 1944 which extended the 1925 tenancy and, except for some modifications, continued the original terms.

The obligation of the defendant as landlord to " repair the damage " where premises were rendered untenantable because of fire or the elements was not affected by the express terms of the 1944 extension agreement.

Some modifications were then made, however, which defendant contends bear upon whatever obligation it might otherwise have " to repair the damage " upon the occurrence of one or the other of the stated casualties.

One such provision in the 1944 lease was that the tenant then agreed that it would " keep and maintain " the interior of the premises, and the leased personal property, in repair and surrender both kinds of property when the lease terminated in good condition. " Excepted " from this obligation, among other things, was damage by fire or " the elements or other casualty ".

Another provision added in 1944 was that in relation to " governmental " orders or regulations the tenant agreed to execute them in the " interior of the demised premises ", but not to the extent of any " structural " changes; while the landlord agreed both to maintain the exterior in " good condition and repair " and to execute governmental orders and regulations on the exterior.

In late May of 1946 a disastrous flood in the Chemung River inundated a large part of Elmira's business district. In its path was the theatre. Water covered portions of the auditorium and at its height reached a point thirty-two inches above the floor of the stage. There was extensive damage to the interior of the theatre and the leased personal property suffered especially.

The Referee found that the result of the flood was one of the things the parties had meant in the lease by damage by " the elements ", and on this appeal no one argues that the language used in 1925 means anything else. While the Referee found for the defendant and judgment has been rendered in its favor, he did so on the ground that opportunity to make the repairs with reasonable diligence had not been afforded to the defendant by the plaintiff.

On the question of the general obligation of the defendant to repair the damage caused by the flood to the personal property as well as to the interior of the demised premises under the lease the Referee found for the plaintiff.

Defendant contends on this branch of the case that the modifications of the lease in 1944 relieved it of any obligation to make repairs to the interior of the demised premises due to the elements and that even under the language used in 1925 it would have had no obligation to repair such damage to the personal property. Defendant, although respondent here, asks reversal of the findings in this respect without having served a notice of appeal.

On this issue we think the Referee was entirely right in his judgment. The argument pursued by the defendant in effect is that when the landlord in 1944 assumed in new and express language the obligation to keep the exterior in repair it amounted to a fresh limitation of its obligation and became the measure of its full extent, and that the scope of the landlord's duty thereafter in respect of repair of damages in the case of injury by the elements was to the exterior of the building.

But what the parties in 1944 were doing was apportioning between themselves ordinary maintenance and the cost of compliance with public regulation. The tenant assumed interior costs and the landlord assumed the cost on the exterior. The tenant also assumed the duty of keeping the personal property in condition.

The parties were careful to exclude damage caused by the elements from the tenant's obligation to keep the interior of

the theatre and personal property in good condition. To the extent that the parties in 1944 touched at all upon damage by the elements they expressly excluded it from any obligation assumed by the tenant.

Nothing they wrote in 1944 would appeal to the reasonable man as suggesting any new apportionment of the casualty risks of fire or the elements, and the parties went pretty far to make this explicit when they added the condition that unless thereby " specifically modified " the covenants of the lease of 1925 " shall remain in full force and effect ". Those, of course, included the assumption by the landlord of damages from fire or the elements, and we think, as the Referee did, that this undertaking continued in full force.

But even if the 1925 casualty obligation of the defendant be deemed to have survived the modifications of 1944, defendant further argues that it had no duty in respect of the restoration of personal property after flood damage. A very substantial portion of plaintiff's claim is based on the need to repair or replace damaged personal property.

On this issue the finding of the Referee also was for the plaintiff. He treated the personal property and the real estate together as constituting the " leased premises " and found that the total amount of expenditures made by the plaintiff in restoration after the flood " were necessarily incurred by the plaintiff in repairing said flood damage to the leased premises ", and in this respect also we think he decided correctly.

The term " premises " customarily is used to refer to the land or its appurtenances, but this is not because the word itself is thus limited definitively but because it is usually the intention of the parties that it have this direction of reference. Used in a context showing a wider intent, it may have a meaning which will include personal property in an integral use with the land.

In writing for this court in *Proctor Troy Properties Co.* v. *Dugan Store* (191 App. Div. 685, 688), KILEY, J., expressed the view that the word " premises " is an elastic and " inclusive " term, and he added upon the quoted authority of a then standard work, that it " ' may or may not include land ' ".

In a careful opinion at Special Term in 1944, Mr. Justice MOREHOUSE held that the parties to a lease of real and personal property to be used as a drugstore containing an option to purchase " the above described premises " intended to include the personalty as well as the realty within the term " premises ".

(*Gardner* v. *Bentley*, 183 Misc. 406. Cf. *Spoor-Lasher Co.* v. *Newburgh Gas & Oil Co.*, 245 App. Div. 329.)

The 1925 instrument made reference to the " premises leased " and stated further that the " lease covers " a " generally mentioned " enumeration of personal property to be implemented by a schedule. Defendant thereby also agreed to " furnish and equip the demised premises " with the property needed for a theatre.

Thus the personal property and the real estate seem to bear such a relationship to each other and to the use which was to be made of both together that here, at least, the parties meant to include both when they wrote down the term " premises " and when they again used that term in providing for the contingency of an untenantable condition due to fire or the elements and the defendant's duty thereupon to repair " the damage ".

This meant pretty clearly an obligation to restore the theatre to operating condition. Untenantability in the sense the parties meant it was at least as much the product of the destruction of the personal property usable in the theatre operation as of the injury to the interior of the building.

The parties treated these two in a unitary sense again in the 1944 agreement when the tenant agreed to keep both the interior of the demised premises and the personal property in ordinary repair. The context of the language expressing the obligation to " repair the damage " when the premises are rendered untenantable by casualty seems to us to sweep in together damage to both kinds of property.

If the precise language that was used to express the untenantability agreement of the parties is looked at more closely, it tends to confirm this view. It is not the " damage to the premises " or to " the demised premises " that the landlord agrees to repair. The landlord agrees, rather, to repair " the damage " that would occur " where " the premises are rendered untenantable.

Therefore, if the premises are rendered untenantable, a fact which is not here in serious dispute, the landlord would be required to repair " the damage ". It would be difficult to argue deteriorated and integrated personal property out of the field of " damage " where the deterioration and the untenantability alike were the result of the same casualty from the elements.

But while the Referee found for the plaintiff on these issues of fact and law, he found generally in the case for the defendant, as it has been noted, and the judgment went in defendant's

favor because he was of opinion the plaintiff proceeded with the repairs without giving the defendant an opportunity to make them in the light of defendant's obligation to repair '' with reasonable diligence ''.

We think the record does not sustain this result. Since the defendant argued on the trial and continues to argue strongly on this appeal that it had no obligation to repair the flood damage at any time or to any extent, it has some plain difficulty in leaning also on the argument that even if it had wanted to perform its part of the contract it had been denied opportunity.

An unwelcome opportunity is not quite the equivalent of a denied opportunity; the word itself implies a readiness for acceptance. At some point in the litigation defendant was bound to take a consistent position either that it need not, or else could not, perform this condition of the lease and we think that that necessity matured at the trial.

Plaintiff would be justified in proceeding to make the repairs if it were reasonable to think defendant would not make them and we think the facts all point in that direction.

Certainly if plaintiff could then see as much of defendant's corporate mind on the subject as now can be seen in the light of its ultimate argument that it never had any responsibility for these repairs, no one could quarrel with the fact plaintiff went ahead and did the work.

From the very outset of the controversy the defendant's conduct and, in the one written communication that it sent to plaintiff, its words, would indicate to a reasonable man that defendant did, and would, disavow responsibility to repair the flood damage.

The Referee felt that immediately after the flood the parties '' dealt with each other at arms length '' and there was no co-operation on either side. But their wariness of each other did not affect their reciprocal rights and duties under the lease.

Promptly on the day the flood reached its height, May 28th, plaintiff sent notice by registered mail to defendant of the '' Flood Loss '' in the theatre and asked defendant to give its attention to that subject. It has been found as a fact that on May 28th the president of the defendant corporation '' knew from personal observation '' that the premises had been rendered wholly untenantable, and, indeed, his presence in the building is not disputed.

Nothing being done by defendant to undertake or to offer to undertake to make repairs, plaintiff on June 3d sent a further letter by registered mail to defendant calling attention to the

earlier letter and to the defendant's obligation to " repair the damage " and asking, in effect when the defendant would perform.

To this came an enigmatic answer dated June 6th from defendant telling the plaintiff that it (plaintiff) was " not familiar with all of the details of this matter ". Whatever this meant it could not be regarded after plaintiff's specific request for performance other than as a disavowal of responsibility or an election to assume the legal risk of nonperformance.

It is of no consequence whether some of the work was done before the letter of June 6th or after. It was prudent judgment, and it tended to cut the defendant's cost, for plaintiff to do the work if the defendant showed no diligence in undertaking it or remained apparently indifferent to its obligation.

We are of opinion it not only showed a lack of diligence; it showed, as it still shows, no intention whatever of performing, and nothing that plaintiff did in instituting the process of restoration had the slightest effect on the course of defendant's policy and action.

The amount of plaintiff's expenditures is not in dispute on the appeal and it has been found by the Referee that $19,721.53 was " necessarily incurred by plaintiff in repairing said flood damage to the leased premises."

The judgment should be reversed on the law and the facts and judgment in favor of plaintiff entered for $19,721.53, with costs, and the order to be entered should adopt the appellant's proposed findings of reversal and new findings.

FOSTER, P. J., HEFFERNAN, BREWSTER and COON, JJ., concur.

Judgment reversed, on the law and facts, and judgment in favor of plaintiff entered for $19,721.53, with costs in all courts; and the order to be entered to adopt the appellant's proposed findings of reversal and new findings.