In the Matter of TRUSTEES OF SAILORS' SNUG HARBOR IN THE CITY OF NEW YORK, Appellant, against BENJAMIN F. FEINBERG et al., Constituting the PUBLIC SERVICE COMMISSION OF THE STATE OF NEW YORK, et al., Respondents.

Third Department, November 18, 1954.

*Walter E. Warner, Jr.,* and *F. Davis Gardner* for appellant.

*Joseph J. Doran, George H. Kenny* and *Charles R. Gibson* for Benjamin F. Feinberg and others, constituting the Public Service Commission and another, respondents.

*Arthur L. Webber* and *Colley E. Williams* for Consolidated Edison Company of New York, Inc., respondent.

BERGAN, J. In 1951 the Public Service Commission terminated generally the practice of submetered resale of electric current by landlords to commercial tenants in New York City; but it allowed such resale to continue '' at premises '' where it had been carried on on July 31st of that year. Other questions arise in the proceeding before us, but the main one is to determine through what physical permutations in the structures on land the right to resell electricity '' at premises '' survives.

The corporate petitioner Trustees of Sailors' Snug Harbor is the owner of extensive land in the city of New York. It petitioned the Public Service Commission on July 11, 1952, for a determination the effect of which would have been to permit the petitioner to resell electricity bought by it from Consolidated Edison Company to its tenant at a new structure to be constructed at 761–765 Broadway. The Public Service Commission ruled adversely to the application and this proceeding reviews that determination.

For some twenty-five years the petitioner had been selling to its tenants in the former structures at 761–765 Broadway electricity furnished it by the public utility and the buildings had been submetered for this purpose. It was doing this on July 31, 1951, the cutoff date of the exception to the 1951 regulation against resale of electricity by a nonutility landlord.

The record indicates that at these structures and in the rest of the block, which petitioner also owns, it was submetering and furnishing electricity in a total of some forty-two buildings. We are directly concerned in this proceeding, however, only with

the former buildings and the new construction located at 761–765 Broadway. As to the land and structures existing in July, 1951, it is conceded that the petitioner had the right to continue to sell electricity to nonresidential tenants under the exception in the commission's regulation.

The landlord has, however, entered into a lease of premises 761–765 Broadway, which requires the tenant to demolish all the structures at those street numbers and to erect an entirely new building which will contain, in the language of petitioner's brief, '' substantially increased commercial and residential space ''. The lease contemplates the sale of electricity by the petitioner to the tenant and the submetering and sale by the tenant to its commercial subtenants.

The old buildings were taken down late in 1951; for a short time in 1952 the land was used as a parking area in which electricity was supplied through petitioner; but in June, 1952, the land became entirely vacant and no electricity was being supplied there by the petitioner at the time of the hearing before the commission.

The petitioner argues that it has the right to submeter the new building and sell electricity to its tenant therein for use of nonresidential subtenants because the new building as well as the old ones are deemed to be the same '' premises '' at which on July 31, 1951, petitioner was supplying electricity under the exception allowed in the general order of the commission.

In professional conception the word '' premises '' usually means a location on land. It includes a structure, if there is one, and the area within and without such a structure; but its use has not always been confined to those appurtenances in or relating to the structure which are technically part of the realty itself. (*Warner Bros. Pictures* v. *Southern Tier Theatre Co.,* 279 App. Div. 309; *Gardner* v. *Bentley,* 183 Misc. 406.) While '' premises '' would seem always to refer to a location on land, it need not necessarily mean the land itself (*Proctor Troy Properties Co.* v. *Dugan Store,* 191 App. Div. 685, 688). It is not easy to conceive of using the word to mean land wholly vacant; because it seems to imply the utilization as well as the existence of the location to which it refers; but that the word has been treated as having some variability and latitude in legal meaning was recognized and discussed in the *Proctor Troy Properties* case (p. 688).

There can be little doubt that for some purposes and in certain legal utilizations the location at 761–765 Broadway would be treated as the same '' premises '', considering the old buildings

and considering the new one. Street numbering is one that comes readily to mind. But for other purposes it would be perfectly clear that a man referring to the " premises " located there when the old buildings stood on the land would not mean the new and modern structure which replaced them. Concepts relating to health regulations, sanitation, rental and a host of others would conceive of the " premises " then and now as something quite different, even though both the old structures and the new one occupy the same location.

Where there is an area for difference of definition, as lawyers might look at the question, we are not prepared to hold readily that the Public Service Commission was unreasonable in the way it construed its own order or to hold on such a point that there should be an annulment of its determination for thinking and holding one view or the other.

It is helpful in touching on the reasonableness of the action of the commission to look at the broad context of the tariff in which the word " premises " appears, and at its underlying purpose. The commission was terminating submetering by landlords and the metered sale of electricity by them to commercial tenants. Resale to residential tenants had previously been terminated.

It was recognized both that there had been an earlier favorable view of submetering in New York as being in the public interest, and that there were many instances in which substantial investment in the way of wiring and installation of other equipment might be destroyed by imposing an inflexible termination date. But it was equally clear that for the future and in truly new uses resale of electricity and submetering would be replaced, and ultimately entirely replaced, by a direct service relationship between the consumer and the public utility as a matter of public policy.

The tariff provision of the Consolidated Edison Company filed in pursuance to the commission's direction was that " electric service will not be supplied * * * for resale * * * except to customers at premises who engaged in resale * * * on July 31, 1951 ". The reasonableness of the general prohibition was reviewed here and sustained in *Matter of Campo Corp.* v. *Feinberg* (279 App. Div. 302, affd. 303 N. Y. 995).

The hardships which the commission sought to cushion were those related to the investment in structures specially equipped for submetering; it was reasonable that as to such landlords the effect of prohibiting resale through submetering be postponed; but the purpose to eliminate the practice generally is

manifest from the tariffs filed and was well within the power of the commission, as this court found.

There is nothing about land alone which would require such an exception or that would give the exception logical justification. The need for the exception arises from the adaptation of existing structures to a special use. When the structure is gone and the land is vacant, or when the structure is gone and replaced by another, there is nothing remaining about the " premises " which would require protection to former private arrangements for the sale of electricity.

The old arrangements in such a case have been eliminated and the new ones can be laid out to meet the new conditions. To hold that the owner of vacant land would always automatically and invariably come within the exception if he had sold electricity to tenants on July 31, 1951, would open the way to radical extension of the right to submeter and resale in larger structures and to tenant groups of greater magnitude than those previously served. The regulation ought not necessarily to be construed that way; and it seems to us reasonable to rule, as the commission has, that the right of petitioner to sell electricity at the " premises " 761–765 Broadway terminated when the old buildings were demolished and replaced by the new one.

The commission has, however, retained the right to permit resale of electricity and remetering under the tariff even though the landlord was not reselling electricity to tenants on the cutoff date. The tariff opens with the proviso " Unless otherwise ordered by the Public Service Commission ". Petitioner makes the additional point in this proceeding that because of permission granted by the commission to submeter electricity in certain other instances, the determination not to allow the petitioner to submeter and resell is discriminatory.

When the instances cited are examined, however, it will be seen that in each case a structure designed for submetering was well on the way to completion at the cutoff date and that the same injustices which led to the approval of the exception would have been applicable to the owners of those structures. Petitioner's land was vacant almost a year after the cutoff date in July, 1951.

Petitioner also argues that the permission given to the Port of New York Authority to submeter at Idlewild Airport aids its contention of discrimination; but only the most tenuous analogy could bring petitioner's situation close to that at Idlewild. There, many miles of wire and other distribution facilities were owned by the Authority; and the utility could not be

required to render direct service through these facilities, or as a practical matter be required to build parallel installations. The tariff was not intended to prohibit submetering where the utility itself was unable to furnish direct service to the consumer.

The order of the commission should be confirmed, with $50 costs; and the order of Special Term which makes certain directions as to the return should be affirmed, with $10 costs.

COON, HALPERN, IMRIE and ZELLER, JJ., concur.

Determination of the Public Service Commission confirmed, with $50 costs; and the order of the Special Term affirmed, with $10 costs. [See 284 App. Div. 1090.]