[Civ. No. 17616. First Dist., Div. Two. July 29, 1957.]

GEORGE W. MORSE, Respondent, v. PACIFIC GAS AND ELECTRIC COMPANY (a Corporation), Appellant.

Robert H. Gerdes and Malcolm H. Furbush for Appellant.

Blaine Pettitt and J. E. Hahesy for Respondent.

DOOLING, J.—This is an appeal from a verdict and judgment in favor of plaintiff in the sum of $3,000. Respondent brought his action to recover damages suffered when appellant disconnected electric service to two houses on respondent's property because of failure to pay for electric service supplied to one of the houses.

Respondent had three accounts with appellant. One was an agricultural account covering the pumping plant. The other two accounts covered the west house and the east house situated on respondent's property. The pump and the east house were supplied with electricity in 1949. In 1952 the west house was provided with electricity under a three-year written contract required by appellant because of the cost of installing a new transformer. The contract provided for assignment with appellant's written consent and assignee's agreement in writing to perform the contract provisions.

In the fall of 1952 respondent rented the farm to his son George D. Morse, excepting the east house. At this time respondent testified that he went to the Selma office of appellant and instructed an employee of appellant to transfer the pump account and the west house account to his son's name, that the employee looked up the account records and respondent identified the accounts in question and that the employee agreed to transfer the accounts.

The pump account became delinquent for nonpayment in the summer of 1953 and service to it was discontinued.

The accounts on both the east and west houses became delinquent in early 1954. On May 3 the bill for the east house was paid by plaintiff but he refused to pay the bill on the west house. Later that day service to the west house was disconnected. Respondent's son had left the farm May 2 and respondent had moved into the west house. Respondent strung a line from the east house to bring electricity to the west house and thereafter paid double rate bills on the east house account. The hot water heater in the west house could not be operated because it required 220 volts and dairy operations had to be discontinued.

On approximately May 8 respondent visited appellant's office and was informed that the bills for the west house were in his name and that he was obligated to pay them. On June 30, 1954, service to the east house was disconnected. Respondent consistently refused to pay the bill for the west house claiming that the obligation had been transferred to his son.

The first question presented is whether the written agree-

ment under which respondent had bound himself to pay for electric current supplied to the west house was terminated by the conduct of the unidentified employee who, according to respondent's testimony, agreed orally to transfer this account to his son. The contract by its terms could only be assigned with appellant's written consent and the assignee's agreement in writing to assume its obligations. Respondent knew the terms of this contract and yet he testified that he acted and relied on the mere oral agreement of an unidentified employee to transfer the account to his son's name. The account in fact was not transferred and the bills throughout were made out in respondent's name and mailed to his address. They were received there by the son and the payments were made by him. The only evidence on that subject is that employees in the appellant's office had authority to transfer ordinary accounts, but no authority to consent to the transfer or termination of accounts covered by written agreement such as the one here in question. Respondent testified that he knew that the written agreement was in effect at the time but did not mention it to the unidentified employee. ''I didn't say nothing about that. I figured that was their business.''

 The unimpeached and uncontradicted evidence is that this employee had no actual authority to transfer or terminate the written agreement. His mere presence in the office waiting upon customers of appellant was not enough to clothe him with ostensible authority to do so. ''[I]t is established that ostensible authority can be created only by the acts or declarations of the principal, not by those of the agent, and this is implied in the code definition of ostensible agency. A belief that the agent has authority, founded on the agent's statement alone, is not sufficient, for a party has no right to take an agent's word for the existence of his authority.'' (2 Cal.Jur.2d, Agency, § 50, p. 698.) Respondent knew that he had a written contract which could only be assigned by written consent. Employers would be at the mercy of their clerks employed by them to deal with the public if it were held that the mere fact of such employment alone gave to such clerks ostensible authority to modify or terminate their employers' written contracts.

The lack of actual or ostensible authority on the part of the unidentified employee to consent to the assignment or termination of this written agreement is a complete answer to respondent's claim that the contract was terminated. Respondent remained bound by his written agreement to pay

for the electricity supplied to the west house and his claim, asserted to the appellant, that the obligation had been transferred to his son was not legally supportable.

Respondent was given a notice by mail addressed to him at his proper address on April 26, 1954, that the electric service to both houses would be terminated if he did not pay the past due electric bills for both. This notice contained on its face the following: "A summary of Rules and Regulations approved by the Public Utilities Commission of the State of California concerning payment of bills is shown on the reverse side."

On the reverse appeared the following pertinent to this case:

"RULE 10. DISPUTED BILLS.

"In case of a dispute between the customer and the Company as to the correct amount of a bill for utility service, the customer may deposit with the California Public Utility [sic] Commission, State Building, San Francisco 2, California, the amount claimed by the Company to be due. Remittance must be payable to the California Public Utilities Commission. Upon receipt of said deposit, the Commission will investigate and communicate its findings to the parties concerned.

"RULE 11-B. NON-PAYMENT OF BILLS.

"1. When a bill for utility service has become past due and a five-day discontinuance of service notice for nonpayment of bill has been issued, service may be discontinued if bill is not paid within the time required by the notice.

. . . . . . . . . . . .

"3. If a customer is receiving service at more than one location, service at any or all locations may be discontinued if bills for service at any one or more locations are not paid before becoming past due."

The notice mailed to respondent contained the past due amounts for the east and west houses but not the pump. By this notice respondent was advised that if he did not pay both bills service to both houses might be discontinued and he was further advised that if he disputed the amount of the bill he should pay the amount to the Public Utilities Commission and the Commission would adjudicate the dispute.

Rules 10 and 11(B) on file with the Public Utilities Commission were introduced in evidence. Rule 10 reads:

"DISPUTED BILLS

"In case of a dispute between the customer and the Company as to the correct amount of any bill rendered by the Company for electric service furnished to the customer, the

customer will be notified by the Company to deposit with the Railroad Commission of the State of California, either at its office in the State Building at San Francisco or at its office in the State Building at Los Angeles, the amount claimed by the Company to be due. Checks or other remittances for this purpose shall be made payable to the Railroad Commission of the State of California. Upon receipt of said deposit the Commission will investigate the facts and communicate its findings to the parties.

''Failure on the part of the customer to make such deposit within 15 days after written notice by the Company that such deposit be made or service may be discontinued, shall warrant the Company in discontinuing the service to the customer without further notice.''

Rule 11(B), so far as here pertinent, provides:

'' (B) Nonpayment of Bills:

''1. When a bill for electric service has become past due and a 5 day discontinuance of service notice for nonpayment of bill has been issued, service may be discontinued if bill is not paid within the time required by notice. A customer's service, however, will not be discontinued until the amount of any deposit made to establish credit for that service has been fully absorbed.

. . . . . . . . . . . . .

''3. If a customer is receiving service at more than one location, service at any or all locations may be discontinued if bills for service at any one or more locations are not paid within the time specified in paragraph A, provided, however, that domestic service may not be discontinued because of nonpayment of bills for other classes of service.''

These rules were filed with the commission. They are conclusively established as reasonable rules and the discontinuance of service pursuant to such rules is a complete answer to a cause of action for damages caused thereby. (*Carpenter v. Los Angeles Gas & Elec. Corp.*, 41 Cal.App.2d 369 [106 P.2d 916].)

Respondent argues that he was not given the notice required by rule 10. The notice of April 26, 1954, contained the reference above quoted to rule 10 and the electricity serving the east house was not cut off until June 30, 1954, much more than the 15 days after notice required by rule 10. We are satisfied that at least as to the east house this notice was sufficient to satisfy rule 10. Since the damages awarded cannot be segre-

gated between the two terminations of service the error in instructions hereinafter discussed is fatal to the judgment.

The court read rules 10 and 11(B) to the jury and instructed that ". . . refusal to furnish service or discontinuance of service in accordance with the rules and regulations on file with the Public Utilities Commission is a complete defense to any action alleging either a failure to furnish service or a discontinuance of service." This was a correct instruction. (*Carpenter* v. *Los Angeles Gas & Elec. Corp., supra,* 41 Cal.App.2d 369.)

The court further instructed the jury: "You are instructed that where the facts indicate that there is ground in good faith to dispute the correctness of the amount claimed due by a public utility service company, the consumer upon tendering the rate for the current term is entitled to have the service continued pending a settlement of the disputed overdue account."

█ This rule was applied as against a municipal corporation not subject to the jurisdiction of the Public Utilities Commission (*Schultz* v. *Town of Lakeport,* 5 Cal.2d 377 [54 P.2d 1110, 55 P.2d 485, 108 A.L.R. 1168]) but where rule 10 is applicable its provisions as to disputed accounts must control since the Public Utilities Commission's jurisdiction is paramount (*Carpenter* v. *Los Angeles Gas & Elec. Corp., supra,* 41 Cal.App.2d 369). The giving of the latter instruction must therefore be held to have constituted prejudicial error.

█ There was a conflict in evidence as to whether the appellant insisted on the payment of the pump account as a condition to continued service to the houses. If it did it violated rule 11(B)3 above quoted. Because of the erroneous instruction above discussed it is impossible to know how the jury resolved this conflict in the evidence.

There is also a conflict in evidence as to whether respondent received the notice of April 26, 1954. There was testimony that it was mailed to respondent at his address which raises a presumption of its receipt. (Code Civ. Proc., § 1963, subd. 24.) How the jury may have resolved this conflict is also uncertain. If they followed the erroneous instruction they could give judgment to plaintiff on the sole ground that there was a bona fide dispute of the amount of the bill and plaintiff tendered the rate for the currrent term, even though they might also find that he had proper notice of rule 10 and did not follow its provisions.

 Respondent further testified that his son was given authority by him to receive his mail. If the son received the notice of termination respondent might be bound by it on principles of agency. (Civ. Code, § 2332; 2 Cal.Jur.2d, Agency, § 160, p. 855.)

Judgment reversed.

Kaufman, P. J., and Draper, J., concurred.

A petition for a rehearing was denied August 28, 1957, and respondent's petition for a hearing by the Supreme Court was denied September 25, 1957. Carter, J., was of the opinion that the petition should be granted.