Wallace E. MARTENS, Appellant,

v.

Edward H. METZGAR and Mary S.
Metzgar, Appellees.

No. 1885.

Supreme Court of Alaska.

July 12, 1974.

Kenneth P. Jacobus, of Hughes, Thorsness, Lowe, Gantz & Clark, Anchorage, for appellant.

John S. Hellenthal, Robert H. Reynolds, of Reynolds & Tobey, Anchorage, for appellees.

Before RABINOWITZ, C. J., and CONNOR and BOOCHEVER, JJ.

## OPINION

RABINOWITZ, Chief Justice.

This appeal involves a dispute as to who should pay the costs of utility improvements which were constructed adjacent to 12 lots in the Geneva Woods subdivision in Anchorage.

In 1967, appellant Wallace Martens was the owner of a tract of land outside the city limits of Anchorage. Martens subdivided this land into the Geneva Woods and Central City subdivisions, the former intended to be residential and the latter primarily commercial/industrial.

Martens entered into an agreement with McQuaid's Realty whereby that realty company, or more specifically realtors Roger McQuaid and Howard Hall, would have the exclusive right to sell all properties within the two subdivisions, with Martens reserving to himself the right to also sell lots. Martens testified at trial that part of this agreement was that the prices to be quoted for the land were to be "unimproved" prices, since improvements had not yet been installed in either subdivision and the cost of such improvements was uncertain.

Appellee Edward Metzgar, who had been involved in prior real estate dealings with Howard Hall of McQuaid Realty, was informed of the availability of residential lots in the Geneva Woods subdivision by Howard Hall. On June 21, 1967, Metzgar signed an Earnest Money Receipt prepared by Hall, offering to purchase 12 lots in the Geneva Woods subdivision for $91,500.[1] On June 28, Martens signed the agreement for the sale and purchase of the 12 lots.

At the time of the signing of the Earnest Money Receipt, the land in the Geneva Woods subdivision was in an unimproved condition. No mention was made in the written agreement of any improvements to be installed. Metzgar was permitted to testify at trial that Howard Hall had assured him at the time of the signing of the agreement that the land price included improvements that were to be installed at a later date by the subdivider. Mary Metzgar, the wife of Edward, testified that the day after execution of the earnest money agreement Howard Hall had assured her that the land price included the improvements that had not yet been installed.

On July 24, 1967, Martens submitted a petition to the Anchorage City Council, requesting annexation of the Geneva Woods and Central City subdivisions by the city of Anchorage. In this petition, Martens held himself forth as 100% owner of the land which was proposed to be annexed. On July 25, the Anchorage City Council passed Ordinance 25-67, by the terms of which the Geneva Woods and Central City subdivisions were annexed into the city of Anchorage. This ordinance provided that in the annexed area Martens would construct, by competitive bid contract, interior streets, sanitary and storm sewers, and water mains. The city retained the right to approve all plans and contract prices, to inspect the actual construction, and to ap-

---

1. The terms of the purchase offer were that $7500 was to be paid as a down payment with the balance ($84,000) to be paid as follows: "$6000 or more per year plus interest at 7% per annum. First payment due on or before one year from closing."

prove the final total construction cost of the improvements.

Ordinance 25–67 provided that the costs of the improvements were to be paid for in the following manner:

costs of providing the interior street improvements, the sanitary sewer mains and the water mains for the 1967 platted and approved Geneva Woods and Central City subdivisions within the annexed area to be constructed by Petitioner [Martens] in this ordinance shall be paid by special assessments levied on the properties within the annexed area specially benefitted in accordance with procedures for special assessments set forth in the Code of Ordinances.

The Petitioner in the annexation petition shall, within thirty (30) days after the effective date of this ordinance, execute the necessary petitions to create the special assessment districts required by this ordinance, but if no petition is submitted within said thirty (30) day period, the City's obligations to reimburse the Petitioner as provided in Section 3(b) of this ordinance shall become null and void and the costs and expenses of the improvements constructed or to be constructed shall be the sole responsibility of the Petitioner.

Section 4 of Ordinance 25–67 provided that the ordinance was to be in full force and effect after its first reading, passage and approval.

On September 8, 1967, Metzgar signed a document entitled "Agreement to Create Improvement and Assessment District and Special Power of Attorney." In this document Metzgar appointed Martens as his attorney-in-fact:

for the special purpose of executing and signing petitions for the creation of special improvement districts and/or special assessment districts for Geneva Woods and Central City Subdivision, and agree that said districts may be created, so that water, sewer, street improvements, utilities, and other improvements may be constructed thereon in accordance with

the ordinance of the City of Anchorage, No. 25–67.

Metzgar was allowed to testify at trial that when he signed this document he believed it was simply an authorization for Martens to enter onto his property in order to install the improvements adjacent to his 12 lots.

There is no indication in the record that a petition was ever filed with the city by Martens for the creation of assessment districts pursuant to Ordinance 25–67.

During the remainder of 1967 and through 1968 Martens proceeded to construct improvements in the two subdivisions. On December 13, 1968, Martens made written demand upon Metzgar for a proportional share of the cost of the improvements constructed in Geneva Woods. According to Martens' calculations, the cost of the streets, water mains and sewers prorated over the 12 lots owned by Metzgar came to $55,138. Metzgar refused to pay for the improvements, arguing that the original purchase price of the land had included the costs of these subsequently-installed improvements.

On June 10, 1969, Martens entered into a subdivision agreement with the city of Anchorage. In this agreement, Martens once again represented himself to be the possessor of an estate in fee simple in the Geneva Woods subdivision. The agreement provided that "[i]n lieu of the special assessment district procedures set forth in Ordinance Number 25–67" for recovering improvement costs, Martens would "assume and pay the city for the costs of said improvements."

Martens testified that his purpose in signing this new agreement with the city was to bypass a 25% surcharge that the city imposed in its collection procedure involving assessment districts. By directly collecting the costs of the improvements from the lot owners in Geneva Woods, Martens would bypass the city procedures and save the 25% surcharge. On October 19, 1970, Metzgar sold his 12 lots in Geneva Woods for $225,000.

Martens subsequently filed a complaint against Metzgar seeking to recover $55,138, which sum allegedly represented Metzgar's purported liability to pay the costs of the utilities which were installed. The case was tried before the superior court without jury.

At trial the deposition of Howard Hall, the realtor who had negotiated the sale to Metzgar of the 12 lots in Geneva Woods, was offered as evidence by Martens. The trial judge excluded the Hall deposition following a determination that Martens' counsel had not sustained the burden of demonstrating that he had given Metzgar proper notice of the taking of the deposition.

Following a lengthy and sometimes exasperating and confusing presentation of evidence, the trial court found that there was no express contract between Martens and Metzgar relating to the obligation to construct or pay for utility improvements in the subdivision. The court further found that Metzgar reasonably believed at the time he entered into the written agreement for the purchase of the 12 lots that the purchase price of $91,500 included the cost of utility improvements.

In assessing the evidence presented, the superior court concluded that Martens had failed to establish by a preponderance of the evidence the requisite elements for recovery of the costs of the utility improvements under either an express, an implied-in-fact, or and implied-in-law contract theory. Accordingly, judgment was entered in favor of Metzgar, and this appeal followed.

Martens attacks almost every aspect of the superior court's findings of fact and conclusions of law; nevertheless, the major challenges can be summarized as follows: (1) the *superior court erred in admitting parol evidence with regard to an* alleged oral agreement that was contemporaneous with Metzgar's signing of the land purchase agreement, (2) the trial court erred if it allowed reformation of the original purchase agreement based on the reasonable mistake of Metzgar, (3) the trial court · erred in denying Martens' recovery of $55,138 under either an *implied-in-fact* or implied-in-law contract theory, and (4) if parol evidence was properly admitted with regard to the original purchase agreement or if the reasonable mistake of Metzgar as to the original agreement is relevant to the superior court's final holding, then that court committed prejudicial error in the exclusion of Howard Hall's deposition.

Since Martens challenges a number of the findings of fact, it is appropriate at this point to set forth this court's standard of appellate review of trial court findings of fact. Civil Rule 52(a) provides in part:

> Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.

*See, e. g.,* State v. Stanley, 506 P.2d 1284, 1288 (Alaska 1973) ; Graham v. Rockman, 504 P.2d 1351, 1353 (Alaska 1972).

Martens' initial claim is that the trial court erred in admitting parol evidence which attempted to add to the terms of the written land purchase agreement signed by Martens and Metzgar.[2]

Metzgar signed an Earnest Money Receipt for the purchase of 12 lots on June 21, 1967. Howard Hall was the real estate broker who was present and who supplied the receipt. On June 28, 1967, Martens signed the Earnest Money Receipt, thus effecting a purchase and sale agreement. This written agreement made no mention of any improvements to be installed adjacent to the 12 lots or whether such im-

---

2. The parol evidence rule can be generally stated to require:

> in the absence of a showing of fraud, mistake or accident, the exclusion of parol or extrinsic evidence by which a party seeks to contradict, vary, add to or subtract from

the terms of a valid written agreement or instrument, subject to the limitations hereinafter noted. (footnote omitted) 3 B. Jones, Evidence § 16 :1, at 72 (6th ed. 1972).

*See* Braund, Inc. v. White, 486 P.2d 50, 56 (Alaska 1971).

provements were included in the purchase price. The superior court in a finding of fact which is unchallenged here found that "[o]n June 28, 1956, no water, streets, or other utility connections existed on or adjacent to the lots purchased by defendants [the] Metzgars." The trial court further found that the written agreement involved the purchase of land in its "then existing condition," making no mention of responsibility for either the construction of or the payment for improvements.

At trial Edward Metzgar was permitted to testify that at the time he signed the Earnest Money Receipt on June 21, Howard Hall assured him that Martens would construct improvements in all of the Geneva Woods subdivision at his own expense.[3] Metzgar contends that parol evidence is admissible when it is apparent that the writing does not integrate all the terms of the original agreement. In this regard, Metzgar argues that in the present case the original purchase agreement was, in fact, part written and part oral.

On the other hand, Martens urges this court to hold that Metzgar's testimony on the oral assurances allegedly given him by Howard Hall at the time of the signing of the written agreement should have been excluded. Martens contends that Metzgar's testimony is an attempt to vary the terms of the written purchase agreement, and, as such, should have been excluded by the trial court under the parol evidence rule. An oral agreement relating to the construction of or the payment for improvements adjacent to land is not, argues Martens, "collateral" to a written purchase agreement. In support of this contention, Martens places primary reliance upon

Shelton v. Fowler, 69 Wash.2d 85, 417 P. 2d 350 (1966). In *Shelton,* the court held that the parol evidence rule prohibited purchasers of property from enforcing an alleged oral promise by the seller to improve certain roads in the land development area. The alleged oral agreement was not mentioned in the documents of purchase and sale. While the factual situation in *Shelton,* at first glance, seems very close to that in the case at bar, the Washington court noted repeatedly that:

> . . . the written instruments of sale which were received in evidence as exhibits all contain very specifically detailed promises by both the purchasers and the sellers which were the consideration for the sale. The instruments even contain such provisions as a description of the nature of the water supply and the promise of the seller to reserve an interest in the private community water supply system for the purchasers. The considerations recited in these instruments are very specific and contractual in character. (417 P.2d at 355.)

The *Shelton* court placed a great deal of emphasis on the specificity of the purchase and sale agreements before excluding parol evidence as to the alleged oral promise to improve the roads. The specificity of the agreement in *Shelton* contrasts sharply with the brevity of the Earnest Money Receipt utilized in the case at bar.[4]

We cannot agree with Martens that *Shelton* is dispositive of the parol evidence issue raised in the present case. However, it is, in our view, unnecessary to decide whether the superior court erred in admitting this parol evidence, for any error committed is harmless error.[5]

---

3. Metzgar testified as follows:
   Q. All right. I'll ask you, on the occasion of your signing that document if you had any discussion—whether or not you had any discussion with Howard Hall with respect to pavement, sewer and water?
   METZGAR: Yes.
   Q. And what was that discussion in substance?
   METZGAR: The discussion at that time was that in this very fine subdivision

that the developer would pay—that they had arrived at the prices of these lots to include all improvements; sewer, water and pavement.

4. Judge Burke characterized the Earnest Money Receipt form employed in the case at bar as "The single greatest source of litigation in the courts today."

5. Civ.R. 61 provides:
   No error in either the admission or the exclusion of evidence and no error or de-

The superior court's Finding of Fact Number 26 states:

> There was no express contract between plaintiff and defendants relating to the obligation to construct or pay for the utility improvements in question. The lack of any express contract is admitted by plaintiff.

In finding that there was no express agreement[6] between the parties as to improvements in the subdivision, the trial court was apparently either unpersuaded by the testimony of Metzgar as to what transpired in his dealings with Howard Hall[7] or concluded that in the present case consideration of such parol evidence was improper. In either case, by finding that there was no oral or written agreement between the parties as to the improvements in Geneva Woods, the trial court has in effect adopted the interpretation of the original agreement urged by Martens.[8] The findings and conclusions of the trial court clearly do not vary the terms of the purchase as stated in the earnest money agreement, and any error by the court in the admission of parol evidence is thereby rendered harmless.[9]

Martens' second allegation of error can be disposed of summarily. Martens argues that the trial court's finding of fact that Metzgar reasonably believed that the original purchase price of $91,500 included the cost of improvements cannot support a reformation of the written purchase agreement and is, in fact, irrelevant to the reformation issue.[10]

As the previous discussion makes clear, our interpretation of the trial court's findings of fact and conclusions of law convinces us that it did not regard the express agreement (i. e., the earnest money agreement) as having been "reformed" at all. Finding of Fact No. 26 clearly states that the parties had no express agreement with regard to improvements in Geneva Woods. The trial court, while finding that Metzgar reasonably believed that the $91,500 purchase price included improvements, abstained from holding that the written agreement was reformed on the basis of Metzgar's reasonable mistake. Thus, this alleged error by the trial court is nonexistent.

Martens' principal specification of error in the case at bar is that the trial court in-

---

fect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

6. An express agreement is one in which the parties arrive at their agreement by words, either oral or written. *See* 1 A. Corbin, Contracts § 18 (1963); 1 S. Williston, Contracts § 3 (3d ed. 1957).

7. In addition to the statements quoted in footnote 3 *supra*, Metzgar had testified earlier in the trial as follows:

> I never in my entire life have ever discussed improvements with Howard Hall on the Geneva Woods property to this day until the time that my attorney and I went in and talked to Mr. Hall.

Metzgar later testified that the above statement simply meant that he had never discussed the price of improvements with Hall.

8. Metzgar argues in his brief that although the trial court could have found that reformation of the original purchase agreement was in order, the court simply concluded that such a finding was unnecessary. We cannot agree with Metzgar's interpretation of the holding of the lower court. Finding of Fact No. 26 is quite explicit in declaring that there was no express contract between the parties concerning the obligation to construct and pay for the improvements.

9. We thus reserve for an appropriate future case resolution of the question of whether an earnest money agreement for the purchase of land demands exclusion of parol evidence of a contemporaneous oral agreement on utility improvements.

10. Martens supplements this argument with the alternative contention that if this court believes Metzgar's reasonable belief concerning the original purchase agreement to be relevant, then the propriety of the exclusion of Howard Hall's deposition by the trial court becomes a pertinent issue.

correctly concluded that he was not entitled to recover for the cost of the improvements adjacent to Metzgar's lots under either an implied-in-fact or implied-in-law contract theory. Inasmuch as Martens argues that he is entitled to recover under either theory, it will be helpful at this point to distinguish the two approaches. In Hill v. Waxberg, 237 F.2d 936, 939, 16 Alaska 477 (9th Cir. 156), the court stated:

> An 'implied in fact' [contract] is essentially based on the intentions of the parties. It arises where the court finds from the surrounding facts and circumstances that the parties intended to make a contract but failed to articulate their promises and the court merely implies what it feels the parties really intended.
> . . .
> An 'implied in law' contract, on the other hand, is a fiction of the law which is based on the maxim that one who is unjustly enriched at the expense of another is required to make restitution to the other.

Martens argues that the facts and circumstances of this case clearly establish an implied-in-fact contract between the parties, an agreement whereby Martens would construct the improvements in Geneva Woods and Metzgar would pay a prorated share of the construction cost. As described in *Hill,* a contract implied-in-fact differs from an express contract largely in the character of the evidence by which it is established. Instead of focusing upon a particular oral or written agreement, a court determines the existence and terms of an implied-in-fact contract by a consideration of the intent of the parties, which intent is determined by analysis of the relevant facts and circumstances. Like an express contract, however, an implied-in-fact contract exists only where there is mutual assent between the parties.[11]

Martens draws attention to the following facts to support his contention that an implied-in-fact contract existed between himself and Metzgar with regard to payment for a prorated share of the cost of the Geneva Woods' improvements. The earnest money agreement wherein Martens and Metzgar agreed to the sale of 12 lots for $91,500 made no mention of improvements. The escrow instructions signed by Metzgar on August 2, 1967, provided that Metzgar would be liable for all assessments levied on the 12 lots. On September 8, 1967, Metzgar signed a document authorizing Martens to be his attorney in fact for the purpose of petitioning the city for the creation of assessment districts and the construction of improvements. Martens thereafter proceeded to construct the improvements in Geneva Woods, and there was no protest from Metzgar until payment for a prorated share of the construction cost was demanded.

In arguing that the circumstances in this case indicate the existence of an implied-in-fact contract for the payment of the cost of the improvements, Martens places primary reliance on the "Special Power of Attorney" document signed by Metzgar on September 8. This document was circulated ostensibly for the purpose of permitting Martens to petition the city of Anchorage for the creation of assessment districts in accordance with Ordinance 25–67.

The trial court's Finding of Fact Number 13 reads:

> Ordinance No. 25–67 further provided that [Martens], within 30 days after the effective date of the ordinance (adopted July 25, 1967), would execute the necessary petitions to create the special assessments created by the ordinance, but that if no petitions were submitted within the thirty day period, [Martens] would have the sole responsibility for the costs and expenses for the improvements to be constructed under Section 3(b) of the ordinance.

This finding by the trial court is derived directly from the language found in Ordinance 25–67. Because of an emergency provision in the ordinance, it went into effect immediately upon its passage on July

---

11. 1 A. Corbin, Contracts § 9 (1963) ; 1 S. Williston, Contracts § 3 (3d ed. 1957).

25. When Metzgar signed the power of attorney document on September 8, the 30-day period prescribed in the ordinance for the filing of a petition had already expired. Thus, when Metzgar executed the power of attorney, it was no longer possible for Martens to file a petition for the creation of assessment districts pursuant to Ordinance 25–67. Therefore, the document was inoperative by its own terms, and under the provisions of Ordinance 25–67 Martens himself was obligated to both construct and pay for utility improvements in the Geneva Woods subdivision. This obligation apparently even included the installation of improvements adjacent to the 12 lots owned by Metzgar.[12]

There is the additional consideration that the power of attorney gave Martens the authority only to petition for the establishment of assessment districts by the city so that the improvements could be constructed. The trial court in Finding of Fact No. 18 states that Martens never executed any petition for the creation of assessment districts, and the record before us is devoid of any evidence that such a petition was filed with the city.

Martens argues that the failure on his part to submit a timely petition to the city and the consequent non-establishment of assessment districts is unimportant, and that by signing the power of attorney Metzgar acknowledged a general liability to pay for a prorated share of the cost of the improvements in Geneva Woods. Martens further contends that any variation between a city assessment procedure and a private collection of construction costs is negligible. We disagree.

In the first place, the power of attorney is quite specific in limiting the authority granted therein to the sole purpose of petitioning the city for the creation of assessment districts pursuant to Ordinance 25–67. Secondly, study of the record has convinced us that the trial court's finding of fact that there were substantial variations between the city assessment procedure and the one utilized by Martens is not clearly erroneous. One example of substantial variation in procedure is the lack of any provision for public hearings in Martens' system for collection of construction costs on either the necessity for the local improvements or on the inclusion of particular persons on the special assessment roll.[13]

In light of the above discussion, we do not believe that the special power of attorney can be interpreted as indicating any agreement between Martens and Metzgar regarding either the construction of or payment for improvements in Geneva Woods.

In further support of his contention that the record shows an implied-in-fact contract, Martens points to the escrow instructions signed by Metzgar on August 2, 1967. This document, addressed to the Alaska Title Guaranty Company, provided that the Metzgars were liable for "all assessments levied" against the 12 lots in Geneva Woods. While this provision con-

---

12. In exchange for annexation, Martens had promised to construct by competitive bid contract during the 1967 construction season interior streets, sewer and water mains, and storm sewers throughout the entire Geneva Woods and Central City subdivisions. The ordinance further provided that if a petition for the creation of an assessment district was not timely filed, then "the costs and expenses of the improvements constructed  .  .  . shall be the sole responsibility of [Martens]."

13. AS 29.63.015 provides in part:
(a) The assembly or counsel may prescribe by ordinance the complete special assessment procedure for local improvement, including and subject to the following:

(1) the procedure for filing petitions;

(2) a survey and report by the borough or city executive concerning the need for, desirable extent of, and estimated cost of each proposed local improvement;

(3) *a public hearing on the necessity for the local improvement;*

(4) a resolution of the assembly or council determining to proceed or not to proceed with the proposed local improvement;

(5) *a public hearing by the assembly or council on the special assessment roll for the local improvement;* (emphasis added) *See also* Anchorage City Ordinances 3.080.-010–3.080.300.

tained in the escrow instructions might well indicate an acknowledgment of liability by Metzgar for special assessments levied by the city or state, we think it would be a mischaracterization to portray the provision as indicating an acknowledgment of liability for a demand made by Martens for a benefit he conferred upon Metzgar.

Our review of the record leads us to concur in the trial court's conclusion that the "facts and circumstances . . . fail to show a mutual intention that [Martens] was to install the utility improvements and that [the Metzgars] were to compensate [Martens] therefore." Consequently, we agree with the trial court that Martens has failed to establish the requisite elements to recover under an implied-in-fact contract theory.

Martens argues that even if he is not entitled to recover under an implied-in-fact contract theory, he should have been allowed recovery under a quasi-contract theory.

The doctrine of quasi-contract is not founded on mutual assent, but rather is based on the principle that one individual should not be unjustly enriched at the expense of another.[14] The essential elements of a quasi-contract are:

> benefit conferred upon the defendant by the plaintiff, appreciation by the defendant of the benefit and acceptance and retention by the defendant of such benefit under circumstances such that it would be inequitable to retain the benefit without payment of the value thereof.[15]

Martens contends that it would be inequitable to allow Metzgar to reap the benefit of the utility improvements in Geneva Woods without making him pay a prorated share of the cost of these improvements. Metzgar's lots were substantially improved by the construction of these utilities, and Martens argues the benefits were accepted by Metzgar without objection.

Both parties concede that the utility improvements installed adjacent to Metzgar's property conferred a benefit on that property, and that this benefit was appreciated by Metzgar. The primary issue remaining for decision is whether Metzgar accepted and retained the benefit of these improvements under such circumstances that it would be inequitable for him to do so without payment of the value thereof to Martens.

As was previously mentioned, the trial judge found that Metzgar reasonably believed, at the time he entered into the earnest money agreement for the purchase of the 12 lots in the Geneva Woods subdivision, that the purchase price included the cost of utility improvements. This finding was based on Metzgar's testimony that at the time he executed the Earnest Money Receipt Howard Hall assured him that Martens would construct improvements in all of the Geneva Woods subdivision at his own expense.[16] Our study of the record convinces us that this finding of the superior court relating to Metzgar's belief played a crucial role in its determination that it would not be inequitable to allow Metzgar to retain the benefits of the improvements in question without paying a prorated share of their costs.[17] Given the central role accorded to Metzgar's belief that the price he paid for the lots included the costs of all utility improvements, we now turn to Martens' claim that the trial court erroneously excluded Howard Hall's deposition.

14. See, e. g., Osborn v. Boeing Airplane Co., 309 F.2d 99 (9th Cir. 1962); Hill v. Waxberg, 237 F.2d 936, 16 Alaska 477 (9th Cir. 1956); Smith v. Stowell, 256 Iowa 165, 125 N.W.2d 795 (1964).

15. Home Sav Bank v. General Fin. Corp., 10 Wis.2d 417, 103 N.W.2d 117, 121 (1960).

16. In note 7, supra, we alluded to Metzgar's seemingly inconsistent testimony. Mary

Metzgar also testified that she inquired of Hall as to "who was going to pay for the water . . . pavement and . . . the sewer and he said that . . . cost will not be your responsibility."

17. A person who has been unjustly enriched at the expense of another is required to make restitution to the other. Restatement, Restitution § 1 (1937).

■ We alluded earlier in the opinion to the fact that Hall was a realtor connected with McQuaid Realty, which was given the exclusive right by Martens to sell property within the Geneva Woods Subdivision. In his deposition, Hall testified that he told Metzgar that "The sale price was with the Lots without assessments." [18] This is the only evidence offered by Martens at the trial which contradicts the testimony of the Metzgars as to what they were told concerning inclusion of the costs of improvements in the price of the lots. Thus, any error committed by the superior court in excluding the deposition cannot, in the context of the circumstances surrounding the quasi-contract issue in the case at bar, be characterized as harmless error.

At trial, counsel for Metzgar objected to Martens' use of the Hall deposition on the grounds that he had not received notice in accordance with our Rules of Civil Procedure.[19] After reviewing the written, as well as the oral testimony going to this question, the superior court ruled that Martens was not entitled to use Hall's deposition. We have concluded that this ruling was erroneous in light of the circumstances appearing in this record.

In order to determine if the superior court correctly precluded Martens' attempt to use the Hall deposition, it is necessary to resolve the question as to whether Martens served notice of the taking of Hall's deposition, in accordance with Civil Rule 5(b). In its pertinent parts, this rule of procedure provides:

Whenever under these rules service is required or permitted to be made upon a party represented by an attorney the service shall be made upon the attorney unless service upon the party himself is ordered by the court. Service upon the attorney or upon a party shall be made by delivering a copy to him. . . . Delivery of a copy within this rule means: handing it to the attorney or to the party; or leaving it at his office with his clerk or other person in charge thereof; or, if there is no one in charge, leaving it in a conspicuous place therein. . . . [20]

In regard to whether Martens served the notice of the taking of Hall's deposition in conformity with Rule. 5(b), the record shows the following: Cathy Gann, a secretary in the employ of Martens' attorney, filed an affidavit, prior to trial, that "she personally served a copy of the Notice of Taking Deposition on the office of Richard B. Collins, Esq. . . . attorney for [Metzgars] . . . ." Martens also filed the affidavit of Irving Bertram, an attorney who assisted in representing Martens prior to trial. In his affidavit, Mr. Bertram states that he met with Collins and informed him that "Mr. Hall would be out of town during the scheduled trial and that we therefore desired to take his deposition. . . . We agreed that the deposition would take place on Tuesday evening, December 14, 1971, at the hour of 7 PM." Bertram also asserted that he told Collins "that the deposition would take

18. Hall also testified in his deposition that it was not unusual to sell lots with improvements included in the purchase price.

19. Civ.R. 30(b) provides in part that:
(1) A party desiring to take the deposition of any person upon oral examination shall give reasonable notice in writing to every party to the action.

20. Former Civ.R. 26(d)(3) [b] provides:
At the trial or upon the hearing of a motion or an interlocutory proceeding, any part or all of a deposition, so far as admissible under the rules of evidence, may be used against any party who was present or represented at the taking of the deposition or who had due notice thereof, in accordance with any one of the following provisions:

. . .

(3) The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds:

. . .

[b] that the witness is at a greater distance than 100 miles from the place of trial or hearing, or is out of the state, unless it appears that the absence of the witness was procured by the party offering the deposition; . . . .
There is no dispute that at the time of trial Hall was out of the State of Alaska.

place unless I notified him otherwise since I had already conferred with Mr. Hall and he had indicated his availability for that day." [21]

Bertram's affidavit was contradicted by Richard Collins' affidavit. According to Collins, "It was suggested by Irving Bertram that . . . [Hall's deposition] could possibly be set up on Tuesday, December 14, 1971, but he would have to check with Howard Hall to make certain. I stated 'Let me know when you set it up.' I received no further communication from Irving Bertram or any other members of the firm of Hughes, Thorsness, Lowe, Gantz & Clark." [22] Collins' secretary also testified at trial. Her testimony was to the effect that she was present in the office throughout the December 10th work day, except for the noon hour, and that she was not served with any notice regarding the case at bar, nor did she see Cathy Gann that day.

In light of essentially the foregoing, the trial court concluded that there was an "unreconcilable conflict" in the testimony of the two secretaries. [23] Taking the view that the burden of establishing the right to use a deposition at trial rests upon the party seeking to use the deposition, the trial court decided that Martens was not entitled to use Hall's deposition, since the evidence going to the issue of notice resulted in a "stand off."

We believe that the trial court erroneously placed the burden of proof on Martens in the circumstances of this case. It is clear from the text of Civil Rule 5 that the delivery requirement is satisfied by leaving the papers with the attorney's clerk or a person in charge of his office, or in the absence of such person, by placing the particular document in a conspicuous place in the office. [24] Professors Wright and Miller conclude that "Service is complete when the papers have been delivered to the attorney or party in the manner described in Rule 5(b) or when they are mailed." [25] Since service is complete upon mailing, nonreceipt or nonacceptance of the papers does not affect its validity. [26] Our own case law is in accord with the views expressed by Wright and Miller.

Jefferson v. Spenard Builders' Supply, Inc., 366 P.2d 714, 717 (Alaska 1961), involved the propriety of the entry of a de-

---

21. Richard Gantz, trial counsel for Martens, testified at trial concerning his unsuccessful efforts to communicate with counsel for the Metzgars at both his office and home on the day scheduled for the taking of Hall's deposition.

Cathy Gann also testified at the trial that she left the notice either with Collins' secretary or "on the desk at the far end of the office."

22. Collins also testified at trial. In addition to reaffirming his affidavit, he added that a search has been made of his office but no copy of the notice of deposition had been located.

23. In the course of his ruling, the trial judge said:

I see no real reason to believe, however, that either one of them, either on the bases of their demeanor or interest in the outcome of the case . . . to believe that either one of those young ladies was being untruthful. I'm afraid that it's going to be one of those mysteries which will never be solved.

24. In 4 C. Wright & A. Miller, Federal Practice and Procedure—Civil § 1141, at 570 (1969), the authors state:

Rule 5 has two basic objectives. First it seeks to insure a full exchange of written communications among the litigants so that each party has a copy of all papers affecting him; as a result, constant reference to the file in the clerk's office is rendered unnecessary. Second it attempts to establish a system for the filing of papers with the clerk that will create an orderly court record. (footnote omitted)

The authors further observe that:

The theory underlying Rule 5(b) is that service of papers on the attorney rather than the party will expedite preparation of a case for prompt adjudication on the merits. § 1145, at 583.

25. *Id.* at § 1147, at 590.

26. *Id.* at 1148, at 590 (footnote omitted). In support of the text, the authors cite in part Claybrook Drilling Co. v. Divanco, Inc., 336 F.2d 697 (10th Cir. 1964); Rifkin v. U.S. Lines, 24 F.R.D. 122, 123 (D.C.N.Y.1959); Bourne, Inc. v. Romero, 23 F.R.D. 292, 296 (D.C.La.1959).

fault judgment. There the trial court struck Jefferson's answer and entered a default based upon an affidavit of opposing counsel that Jefferson had failed to timely serve his answer. In passing on the issue, we said:

> We also hold that the action of the court in striking Jefferson's answer and entering his default cannot be sustained. The judge gave no reasons for his action, and we can only assume that it was based on the affidavit of Spenard's counsel that there had been no timely service upon him of Jefferson's answer to the complaint. But Jefferson controverted that assertion by his statement under oath to the effect that he had mailed his answer to counsel on the last day that service could be made under Rule 12(a). In this state of the record, the affidavit of Spenard's attorney that service was not made can mean no more than that the answer was not received by him. . . .
>
> . . . If mailing was timely, as Jefferson swears it was, there was no basis for entry of his default; for under Civil Rule 5(b) service by mail is complete upon mailing.[27]

Evidence as to the proper mailing of a letter has been held to create a presumption the letter was received by the addressee.[28] In Rollins v. Leibold, 512 P.2d 937, 943–944 (Alaska 1973), this court was confronted with the question as to what effect should be given to a presumption in a jury trial. In *Rollins*, we adopted the rule set forth in the proposed Federal Rules of Evidence that "once the presumption is established the opposing party has the burden of proving that the nonexistence of the presumed fact is more probable than its existence."[29] We believe this rule merits adoption in cases tried to the court without a jury, as well as those tried by a jury.

■ Applying *Rollins* to the case at bar, we have concluded that the superior court incorrectly placed the burden of proof of service on Martens in ruling on the admissibility of the Hall deposition. In our view, Cathy Gann's affidavit created a rebuttable presumption that there had been compliance with Civil Rule 5(b).[30] Once this rebuttable presumption had been established, then under *Rollins* the burden should have been placed upon Metzgar of proving that the nonexistence of the presumed fact is more probable than its existence. Metzgar did not meet this burden by merely producing evidence which the superior court evaluated as "stand off" testimony.

We therefore conclude that the case should be remanded for the limited purpose of taking Howard Hall's testimony, so far as the same is relevant to resolution of the quasi-contract issue.[31] If, after considera-

---

27. Jefferson v. Spenard Builders' Supply, Inc., 366 P.2d 714, 717 (Alaska 1961) (footnote omitted). In *Jefferson*, we remanded to the trial court with directions to the court to find the facts as to the mailing of the answer. Compare Hartsfield v. Carolina Casualty Insurance Co., 411 P.2d 396 (Alaska 1966).

28. *See* Morse v. Pacific Gas & Elec. Co., 152 Cal.App.2d 854, 314 P.2d 192, 196 (1957); 9 J. Wigmore, Evidence § 2519 (3d ed. 1940).

29. Rollins v. Leibold, 512 P.2d 937, 943–944 (Alaska 1973). The proposed Federal Rule of Evidence adopted in Rollins reads as follows:

   Rule 301. *Presumptions in General.*
   In all civil actions not otherwise provided for by Act of Congress or by these rules a presumption imposes on the party against whom it is directed the burden of proving that the nonexistence of the presumed fact is more probable than its existence. Proposed Federal Rules of Evidence 301 (U.S. House of Representatives' tentative draft, H.R. 5463), 42 U.S.L.W. (Supplement, July 17, 1973).

30. In the factual context of this case, we deem it appropriate to analogize the service by mail cases to the service by delivery in question here.

31. No reasons appear in the record why, upon remand, Hall should not appear in person to testify.

tion of Hall's testimony and any other new evidence deemed appropriate, it is concluded that it would be inequitable to permit the Metzgars to retain the benefit of the utility improvements without payment of a prorated share of their value, then the trial court is to determine the amount that the Metzgars should pay to Martens.[32]

Affirmed in part, reversed in part.

ERWIN and FITZGERALD, JJ., not participating.

32. It will be unnecessary to take any additional evidence regarding this question as this subject was gone into extensively at trial.